# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 95-DP-00149-SCT

*WILLIAM L. WILEY*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/03/95 |
| TRIAL JUDGE: | HON. ANDREW CLEVELAND BAKER |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JACK R. JONES III |
| | SUSAN M. BREWER |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| | LESLIE S. LEE |
| DISTRICT ATTORNEY: | N/A |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY (DIRECT APPEAL) |
| DISPOSITION: | AFFIRMED - 2/13/97 |
| MOTION FOR REHEARING FILED: | 2/20/97 |
| MANDATE ISSUED: | 5/5/97 |

**EN BANC.**

**PRATHER, PRESIDING JUSTICE, FOR THE COURT:**

¶1. This capital murder case arises from an August, 1981, shooting/robbery in the Mineral Wells community of DeSoto County. The evidence reflects that J. B. Turner and his daughter were shot and robbed as they left Turner's small convenience store in the early morning hours of August 22, 1981. Turner was killed; his daughter was blinded and received other serious injuries. The murder weapon (a sawed-off shotgun that was traced to the defendant, William Wiley) was found in the undergrowth behind the store. Wiley, age 27, was later arrested. Thereafter, he confessed to waiting in the parking lot for his victims to close the store and then shooting and robbing them. He also led the police to the place where he had discarded the money bag.

¶2. During the past fifteen years, Wiley has been sentenced to death three times for the capital murder of J. B. Turner. From his third death sentence, Wiley now appeals to this Court. Because the issues raised by Wiley are without merit, the sentence of the trial court is affirmed.

<u>**STATEMENT OF THE CASE**</u>

¶3. Wiley was originally tried, convicted, and sentenced to death in February 1982. On direct appeal, this Court affirmed Wiley's conviction. However, the case was remanded for resentencing, due to comments by the prosecutor regarding the reviewability of the sentencing jury's decision. *See Wiley v. State*, 449 So. 2d 756 (Miss. 1984) (*Wiley I*).

¶4. Wiley's second sentencing trial was held in June, 1984. The jury again sentenced Wiley to death, and that decision was affirmed by this Court. *Wiley v. State*, 484 So. 2d 339 (Miss. 1986) (*Wiley II*), *cert. denied Wiley v. Mississippi*, 479 U.S. 906 (1986), *overruled by Willie v. State*, 585 So. 2d 660 (Miss. 1991).

¶5. Thereafter, Wiley's request for post-conviction relief was denied. *Wiley v. State*, 517 So. 2d 1373 (Miss. 1987) (*Wiley III*), *cert. denied Wiley v. Mississippi*, 486 U.S. 1036 (1988). Wiley then filed a petition for writ of habeas corpus in the U.S. District Court for the Northern District of Mississippi. Via an unpublished memorandum, that court denied Wiley's petition.

¶6. Wiley next appealed to the U.S. Court of Appeals for the Fifth Circuit. That court held that Wiley's death sentence was improper because the sentencing jury was incorrectly instructed regarding the "especially heinous, atrocious or cruel" aggravating circumstance, pursuant to the United States Supreme Court decisions in *Clemons v. Mississippi*, 494 U.S. 738 (1988), and *Maynard v. Cartwright*, 486 U.S. 356 (1988). *Wiley v. Puckett*, 969 F. 2d 86, 105-106 (5th Cir. 1992) (*Wiley IV*). The Fifth Circuit instructed the District Court to issue a writ of habeas corpus unless the State of Mississippi initiated appropriate state court proceedings within a reasonable time. *Id.*

¶7. The State did not initiate such proceedings, and Wiley filed a motion and application for life sentence, or, in the alternative, for a new sentencing hearing. In October 1993, this Court ordered a new sentencing hearing for Wiley. *Wiley v. State*, 635 So. 2d 802 (Miss. 1993) (*Wiley V*). In February 1995, Wiley was sentenced, once again, to death. From that judgment, he appeals, and raises the following issues:

**I. WAS THE SENTENCE OF DEATH IMPOSED UNDER THE INFLUENCE OF PASSION, PREJUDICE AND/OR OTHER ARBITRARY FACTORS?**

   **A. DID THE TRIAL JUDGE IMPROPERLY TELL THE VENIRE ABOUT THE POSSIBILITY OF PAROLE?**

   **B. DID THE PROSECUTOR MAKE AN IMPROPER COMMENT DURING CLOSING ARGUMENT?**

   **C. DID THE TRIAL JUDGE ERR BY NOT GIVING A "DIMINISHED CAPACITY" INSTRUCTION TO THE JURY?**

**II. IS THE SENTENCE OF DEATH EXCESSIVE AND/OR DISPROPORTIONATE?**

<u>**LEGAL ANALYSIS**</u>

**I. WAS THE SENTENCE OF DEATH IMPOSED UNDER THE INFLUENCE OF PASSION,**

**PREJUDICE AND/OR OTHER ARBITRARY FACTORS?**

¶8. Wiley contends that the sentencing jury acted under the influence of passion, prejudice, and arbitrariness -- in violation of Miss. Code Ann. § 99-19-105 (3)(a).[1] He raises three arguments: (A) that the trial judge improperly told the venire during *voir dire* about the possibility of parole should Wiley receive a life sentence; (B) that the prosecutor made an improper comment during closing arguments; and (C) that the trial judge incorrectly refused to give a "diminished capacity" instruction.

### A. DID THE TRIAL JUDGE IMPROPERLY TELL THE VENIRE ABOUT THE POSSIBILITY OF PAROLE?

¶9. Wiley first contends that the jury was improperly told about the possibility of parole, should he be sentenced to life in prison. The record reflects that the trial judge was repeatedly questioned by the veniremen during *voir dire* regarding the possibility of parole in the event that a life sentence should be imposed. Wiley bases his argument on the following interactions with the venire during *voir dire*:

> Q. [BY THE DISTRICT ATTORNEY:] But the point is under state law sentencing is individualized. Okay? You've got to hear the evidence, good and bad, about this man and what he did to Mr. Turner in August of 1981 before you can weigh it. There's no automatic death. There may be cases where the death penalty is not the proper punishment. There may be cases where it is. But in order to comply with state law, those elements have to be weighed by a jury. Okay?
>
> Yes, Sir?
>
> A. [Prospective Juror No. 32]. Could you be a little more specific as to what process you're going to go through to have us arrive at this decision?
>
> * * *
>
> [BY THE DISTRICT ATTORNEY:] We're going to have to show you the proof. Otherwise, I don't know how you could make a decision. Does that answer you?
>
> A. Thank you.
>
> Q. Yes, ma'am?
>
> A. (Unidentified Prospective Juror) I have a question. Is this life with no parole or do they -- will there be an opportunity for this jury to distinguish no parole as opposed to the death penalty?
>
> THE COURT: The law says life in prison. The courts or the juries have absolutely nothing to do with parole laws. If the jury finds this person guilty, which has been done, if the jury sentences him to life, we don't know whether it's life with or without because that's up to the executive department. When a jury speaks and when the Court sentences, we're through with that part of it.
>
> BY [THE DISTRICT ATTORNEY]:

Q. Ma'am, does that --

A. I didn't know if there was an alternative of no parole.

A. (Unidentified Prospective Juror) So he could get out after 20 years?

THE COURT: I think the jury must -- I can't answer those type questions. I think the jury is just going to have to approach it as the prosecutor has been saying -- take this, take this and weigh it and make your decision based upon the way you see the evidence, not upon some uncertainty unknown down the road which you have no control over and I have no control over and just call it the way you see it at the conclusion of the trial. That's the only thing we can do. All those contingencies, I don't know what the answers are, nor does anyone else.

I would go back just a minute. I think [the District Attorney] is about to wind down here. If you went back 20 or 30 years ago, the Legislature in Jackson determined what cases carried the death penalty. That didn't make any allowance for local feelings or decisions. Now, if a certain offense falls within this category, then it's up to the people in DeSoto County up here to determine whether that's a vote death penalty case or a life in prison case. It individualizes rather than a big body like the Legislature trying to speak for the state as a whole. It gives the local people an opportunity to take into consideration the crimes and also take into consideration the defendant himself and everything that can be legally admissible about him where you can make the decision based upon all the evidence that can be made available to you rather than just having a category. I don't know whether that helped you or not, but it will never be taken away from you. You will be the ultimate decision makers.

* * *

[BY THE DISTRICT ATTORNEY]: Anybody else having problems with the death penalty?

Yes, Ma'am?

A. [Prospective Juror] No. 183.

Q. [No. 183]?

A. I just have a question. If the jury decides -- does not unanimously decide for the death penalty and life imprisonment is the decision, who -- when is -- when is it justified -- when would it ever be decided that it would definitely be life without parole? I was under the impression that decision could be made in lieu of the death penalty. And what I'm understanding you to say is that the death penalty is not the choice -- there is a possibility that he would be given life imprisonment with parole as a possibility. Is that what you're saying?

THE COURT: That's a possibility, yes.

PROSPECTIVE JUROR [No. 183]: But no jury has the right to say that it's life without parole?

THE COURT: The current status of the law is I'll instruct you as to exactly what the law says

now, and that is if you prescribe death, that's your decision; if you prescribe life in prison, that's your decision. Those are the two options that I'll be --

PROSPECTIVE JUROR [No. 183]: So that is an option?

THE COURT: Yes. It will be in clear black and white print just like I said it just then.

A. [Prospective Juror No. 182] Is that like a hole in the law? To me -- I don't know the circumstances of the case or what happened, and if I look at this case and see that I think this man would be a menace to society for the rest of his life and I don't vote for the death penalty but life imprisonment, I would be inclined more to vote for the death penalty because I don't know if he's going to get out. Is this a --

THE COURT: What is your number ma'am?

PROSPECTIVE JUROR [No. 182]: Oh, I'm sorry, 182.

THE COURT: [No. 182], let me try to help you if I can. I don't know whether I can or not.

PROSPECTIVE JUROR [No. 182]: That kind of bothers me.

THE COURT: I understand that, but you're just exactly like I am and just like the lawyers on both sides. We have to take the law as we find it today, and we have to work with it as we find the law today.

PROSPECTIVE JUROR [No. 182]: So even if we vote for life imprisonment, we're not guaranteed life in prison.

THE COURT: No, ma'am. You'll be doing exactly what the law says. That's what the law says. If there's parole down the road somewhere, I don't have any control of it. I can't guess. I can't second guess it nor can you.

PROSPECTIVE JUROR [No. 182]: Okay. That's somebody else's job.

THE COURT: The Legislature prescribes the punishment, and once we do that, our job ends, and I'm not a soothsayer; I don't know what's down the road nor do you. We'll just follow the law as the Legislature and the Supreme Court tells us it is today and do the best we can.

BY [THE DISTRICT ATTORNEY]:

Q. Anybody else? Yes, sir?

PROSPECTIVE JUROR [No. 52]: No. 52 . . . . In other words, what you're saying, Your Honor, is that if given the choice of life imprisonment or the death penalty, if the jury went with life in prison, the defendant could get out tomorrow, he could be paroled tomorrow technically?

THE COURT: Well, not tomorrow.

PROSPECTIVE JUROR [No. 52]: Well, as soon as the trial is over, as soon as he goes back to jail?

THE COURT: Well, at some point in time, possibly yes, I don't know. The sentencing statute says life in prison.

¶10. After the State concluded *voir dire*, and outside the presence of the jury, defense counsel moved to quash the jury panel and for a mistrial. Wiley contends that the jury pool was tainted because the trial judge informed them that there was a possibility of parole if Wiley were sentenced to life imprisonment.

¶11. Under the sentencing statute in effect at that time, jurors were forbidden to consider parole -- except in habitual offender cases, where a sentence of life imprisonment would automatically be without possibility of parole.[2] *See Blue v. State*, 674 So. 2d 1184, 1195-96 (Miss. 1996); *Mackbee v. State*, 575 So. 2d 16, 40-41 (Miss. 1990). The seminal case on this issue is *Walter Williams, Jr. v. State*, 445 So. 2d 798, 812-14 (Miss. 1984) (hereinafter *Williams*). In *Williams*, this Court held that:

> A jury should have no concern with the quantum of punishment because it subverts a proper determination of the sentencing issue.
>
> Reference to the possibility of parole should the defendant not be sentenced to die are wholly out of place at the sentencing phase of a capital murder trial for two additional reasons.
>
> First, such references inevitably have the effect of inviting the jury to second guess the Legislature. The Legislature has declared that persons sentenced to life imprisonment may under certain circumstances become eligible for parole. It is no more proper for the jury to concern itself with the wisdom of that legislative determination that it is for the jury to consider the Legislature's judgment that death in the gas chamber be an authorized punishment for capital murder.
>
> Second, parole is not automatic. No person sentenced to life imprisonment has any "right" to parole. Allowing argument or testimony regarding the possibility of the defendant some day being paroled is in effect inviting the jury to speculate how *ten years in the future* the parole board may exercise its legislatively granted discretionary authority. This would introduce into the sentencing proceedings an "arbitrary factor" proscribed by [Miss. Code Ann.] section 99-19-105 (3)(a).

*Williams*, 445 So. 2d at 813 (citations omitted). *See also Jessie Derrell Williams v. State*, 544 So. 2d 782, 798 (Miss. 1987); *Cabello v. State*, 471 So. 2d 332, 346 (Miss. 1985).

¶12. Most of the cases dealing with this issue have arisen in the context of closing arguments, jury instructions, or witness's testimony. *See, e.g., Griffin v. State*, 557 So. 2d 542, 553 (Miss. 1990); *Jessie Derrell Williams*, 544 So. 2d at 798; *Williams*, 445 So. 2d at 813. The State argues that these cases should be distinguished, because the trial court in the case *sub judice*:

> . . . steadfastly maintained that the sentencing statute stated that life in prison was the punishment. He further told the jury not to speculate about what would be done in the future as that was not their concern in considering sentence. This situation is totally different than the prosecutor making an argument that a defendant should be given the death penalty because a sentence of life imprisonment would result in parole.

The State would submit that this is not an error requiring reversal of this third death sentence. The trial court gave accurate information to the three prospective jurors who asked questions regarding parole eligibility, and those three jurors did not serve on the jury. The jury was never instructed to consider parole eligibility in determining the sentence to be imposed.

¶13. This Court is persuaded by the State's reasoning, and finds that the case *sub judice* is factually distinguishable from **Williams** and its progeny; for this reason, the analysis expressed in those cases will not be extended to apply to this factual situation. ***See Williams***, 445 So. 2d at 813; ***Griffin***, 557 So. 2d 542; ***Jessie Derrell Williams***, 544 So. 2d 782; ***Cabello***, 471 So. 2d 332. The trial judge followed this Court's instructions to not speculate on parole. He emphasized that the trial court and the jury had no control over parole. When further pressured by the veniremen for a more exact answer, the trial judge gave a truthful response. Moreover, at the close of the presentation of evidence, the trial judge properly instructed the jury regarding the options of life and death. The trial judge's actions in this case did not constitute reversible error; therefore, Wiley's claim on this point is without merit.

### B. DID THE PROSECUTOR MAKE AN IMPROPER COMMENT DURING CLOSING ARGUMENT?

¶14. During closing arguments, the prosecutor commented that the jury did not know whether Wiley's violent actions in this case were a "one-time thing". Wiley argues that, by making these statements, the prosecutor implied that Wiley had a prior criminal record, and that such an implication was not supported by the record. The State argues that the comment was supported by the evidence, and that, furthermore, it was made in response to the following remark made during defense counsel's closing argument:

> [BY MR. JONES]: All the things we have established corroborate what I'm saying about this man not being a killer by instinct. But, again, he did kill. Add that up to him using bird shot. This was a one-time thing, as bad as it is, and I know it's bad, but it's not characteristic of this person.

¶15. As a general rule, "attorneys are to be given wide latitude in making their closing arguments." ***Jimpson v. State***, 532 So. 2d 985, 991 (Miss. 1988) (citing ***Johnson v. State***, 477 So. 2d 196, 209 (Miss. 1985)); ***Shook v. State***, 552 So. 2d 841, 851 (Miss. 1989). "Given the latitude afforded an attorney during closing argument, any allegedly improper prosecutorial comment must be considered in context, considering the circumstances of the case, when deciding on their propriety." ***Ballenger v. State***, 667 So. 2d 1242, 1270 (Miss. 1995); ***Davis v. State*** 660 So. 2d 1228, 1248 (Miss. 1995).

¶16. The comment of the prosecutor that the jury could not know whether Wiley's violent criminal activity was a "one-time" thing was supported by the evidence. The medical experts testified that, if he were under the influence of alcohol, Wiley could perpetrate another violent crime. They further testified that Wiley had alcoholic tendencies, and that the success rate for recovering substance abusers was very low.

¶17. Moreover, the prosecutor's comment rebutted the statement made by defense counsel that this violent crime was a "one-time thing". It appears that given "the context in which the [prosecutor's] statement was made, taken with the supporting evidence in the record, the statement did not amount

to reversible error." ***See Ballenger***, 667 So. 2d at 1271. Wiley's argument to the contrary is without merit.

### C. DID THE TRIAL JUDGE ERR BY NOT GIVING A "DIMINISHED CAPACITY" INSTRUCTION TO THE JURY?

¶18. Wiley also contends that the trial court erred by refusing to grant a "diminished capacity" instruction. The trial judge ruled that such an instruction was not supported by the evidence.

¶19. Diminished capacity or substantial impairment of "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law" is a statutory mitigator under Miss. Code Ann. § 99-19-101 (6) (f). Furthermore, Miss. Code Ann. §99-19-103 provides, in pertinent part, that "[t]he statutory instructions as determined by the trial judge to be warranted by the evidence shall be given in the charge and in writing to the jury for its deliberation." Thus, Wiley was entitled to an instruction on the statutory mitigator of diminished capacity -- if such an instruction had been supported by the evidence.

¶20. Indeed, "[i]nstructions should be given only if they are applicable to the facts developed in the case." ***Williams***, 445 So. 2d at 814. In the case *sub judice*, doctors testified that Wiley is borderline mentally retarded; there was also evidence of his poor performance in school. Furthermore, there was ample evidence of Wiley's alcohol addiction, which, according to one doctor, caused Wiley to have "a diminished cerebral activity, cerebral ability" at the time of the crime. Based on this evidence, Wiley argues that he was entitled to an instruction on the statutory mitigator of diminished capacity.

¶21. This Court holds that the diminished capacity instruction was not supported by the evidence in this case; therefore, Wiley was not entitled to such an instruction. ***See In re Hill***, 460 So.2d 792, 799 (Miss. 1984); ***Williams***, 445 So. 2d 798 at 814; ***see also Carr v. State***, 655 So. 2d 824 (Miss. 1995). In ***Hill***, a somewhat factually similar case, the defendant also argued that the jury should have been given a diminished capacity. This Court held:

> At trial a guidance counsellor from Hill's high school testified that his IQ was about 70, that he was a slow learner, and scored low on achievement tests. She also stated that he had had a car accident in which a friend was killed in 1972. In that car accident Hill sustained a head injury. Thereafter he returned to school and excelled in carpentry work. He went on to graduate and got a college football scholarship. Hill's high school coach testified that after the accident Hill seemed withdrawn. On the basis of this evidence, we find that there was nothing presented which would have warranted an instruction on Hill's capacity to "appreciate the criminality of his conduct" as required by the statute at the time the murder took place. There is no merit to this assignment of error.

***Hill***, 460 So. 2d at 799.

¶22. As in ***Hill***, Wiley had a low IQ and trouble in school. He also had suffered a head trauma and had lost someone close to him (his grandfather). Like Hill, Wiley had thereafter been a productive member of society. Furthermore, there is no evidence that any of these problems caused either of these defendants to suffer diminished capacity at the time of the crime. The difference between Wiley and Hill is that Wiley became addicted to alcohol and drugs. The only evidence of Wiley's alleged

diminished capacity at the time of the crime is the doctor's testimony that Wiley's substance abuse problem caused Wiley to suffer "a diminished cerebral activity, cerebral ability" at the time of the crime. However, there is no evidence that Wiley was substantially impaired in his capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law.

¶23. Because the evidence did not support a diminished capacity instruction, the trial judge did not commit reversible error by refusing Wiley's instruction on this statutory mitigator. Wiley's argument to the contrary is without merit.

## II. IS THE SENTENCE OF DEATH EXCESSIVE AND/OR DISPROPORTIONATE?

¶24. Finally, Wiley argues that the death sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The State argues that the issue of proportionality was decided by this Court in *Wiley II*, which involved the direct appeal from Wiley's second sentencing hearing. In *Wiley II*, the appellant based his proportionality argument on the decision in *Coleman v. State*, 378 So. 2d 640 (Miss. 1979). This Court distinguished *Coleman* and ruled that the death penalty was not disproportionate in Wiley's case:

> Coleman was sixteen years old, as opposed to Wiley's twenty-six years. The victim in Coleman fired first, while Wiley ambushed his victim without warning. Coleman robbed an unoccupied house, while Wiley lay in wait with a loaded shotgun. The facts distinguish these two cases.

> Under the statutory duty of Miss. Code Ann. § 99-19-105 (Supp. 1985), this Court must determine whether the sentence imposed here is excessive or disproportionate to the penalty imposed in similar cases since *Jackson v. State*, 337 So. 2d 1242 (Miss. 1976). This comparison is made from cases in which the death sentence was imposed and was reviewed on appeal by this Court.

> In making this individualized comparison, this Court considers the crime and the defendant. *Cabello v. State*, 471 So. 2d at 332; *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978). In so doing, the comparison leads this Court to conclude that the death sentence upon this defendant is not excessive or disproportionate. Our review reveals nothing that would justify treating this defendant differently from any other defendants given the death penalty since *Jackson v. State*, nor leads this Court to conclude that the defendant should receive a life sentence.

*Wiley II*, 484 So. 2d at 354-55.

¶25. Wiley "concedes that this issue was addressed in [his] second death sentence appeal." However, Wiley argues that no mitigating evidence was presented at either of his first two sentencing hearings, and that, as a result, "the Mississippi Supreme Court was unable to properly consider the peculiar facts of this case and, perhaps more significant, the character of this defendant."

¶26. Mitigating evidence similar to that presented at the third sentencing phase was elicited through cross-examination of the State's witnesses at his second sentencing hearing. *See Wiley III*, 517 So. 2d at 1379. Apparently, however, the evidence of Wiley's alleged mental impairment was not before the jury at his second sentencing hearing. *See Wiley IV*, 969 F. 2d at 98-100. Therefore, this Court

reconsiders the proportionality of Wiley's death sentence in this case.

¶27. A review of other cases indicates that, considering the crime and the defendant, the death penalty in this case was proportionate. *See Cabello v. State*, 471 So. 2d 332, 350 (Miss. 1985) (death sentence was proportionate where defendant strangled and robbed business owner); *Evans v. State*, 422 So. 2d 737, 739 (Miss. 1982) (death penalty was proportionate where defendant waited 30 minutes for business to be free of customers before robbing and shooting store attendant); *Booker v. State*, 449 So. 2d 209, 222 (Miss. 1984) (death penalty was proportionate where defendant shot and robbed business owner); *Conner v. State*, 632 So. 2d 1239, 1265 (Miss. 1993) (death sentence was proportionate where defendant had intelligence quotient "on the low side of 'average'", evidence was contradictory as to whether defendant was schizophrenic amnesiac); *Lanier v. State*, 533 So. 2d 473, 492 (Miss. 1988) (death sentence was proportionate where defendant was mildly mentally retarded, suffered hallucinations, and had been institutionalized twice for alcoholism and drug abuse). *Neal v. State*, 451 So. 2d 743, 763 (Miss. 1984) (death sentence was proportionate where defendant had troubled childhood and was institutionalized at age 10 due to family and learning difficulties and was severely retarded with mental ability of 8-year-old child). Therefore, Wiley's claim that the death sentence is disproportionate in this case is without merit.

## CONCLUSION

¶28. This Court finds that Wiley's death sentence was not imposed under the influence of passion, prejudice, or other arbitrary factors. Furthermore, the death sentence rendered in this case was not disproportionate in comparison to other cases and defendants. Therefore, the judgment and sentence of the trial court is affirmed.

¶29. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH AFFIRMED. EXECUTION DATE TO BE SET WITHIN SIXTY DAYS OF FINAL DISPOSITION OF THIS CASE PURSUANT TO MISS. CODE ANN. § 99-19-105(7) (SUPP. 1996) AND M.R.A.P. 41(a)**.

**LEE, C.J., PITTMAN, ROBERTS, SMITH AND MILLS, JJ., CONCUR. SULLIVAN, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BANKS AND McRAE, JJ.**

**SULLIVAN, PRESIDING JUSTICE, DISSENTING:**

¶30. The Court today holds that jurors, in deliberating the sentence to be given to a capital offender, may consider the possibility of parole should the offender be given a life sentence. This holding defies the intentions of the Mississippi State Legislature, the doctrine of separation of powers, and the doctrine of stare decisis. Therefore, I dissent.

¶31. It is most important that we understand some very crucial concepts.

[T]he penalty of death is qualitatively different from a sentence of imprisonment, *however long*.

Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. *Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.*

*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (emphasis added). And, as stated by the Fifth Circuit:

[The death penalty] is different from all other punitive measures in that it is the most exacting disciplinary mechanism available to a society that considers itself civilized and decent. In addition, the termination of human life is the most final and decisive method for inflicting a penalty that can be conceived. It is precisely the inflexible and terminal nature of the death penalty that makes it a matter of exceeding consequence to assure that before such a condemnation is made the individual receives the full force of the protections and safeguards guaranteed by the Constitution.

*Gholson v. Estelle*, 675 F.2d 734, 737 (5th Cir. 1982). This Court has also recognized the precious difference between life imprisonment and the death penalty, or, life and death. *See Pinkton v. State*, 481 So. 2d 306, 308 (Miss. 1985); *Jones v. State*, 461 So. 2d 686, 690 (Miss. 1984); *Jackson v. State*, 337 So. 2d 1242, 1252 (Miss. 1976). I hold steadfastly to these principles of heightened scrutiny in death penalty cases, and because Wiley was not afforded the full force of the protections and safeguards guaranteed by the Mississippi State Legislature, I dissent.

¶32. First, it must be noted that while this issue is considered by this Court today, one of the statutes under which we are ruling, providing the guidelines for how a capital offender is to be sentenced, has been amended. While sentencing juries of capital offenders have always been prohibited from imposing a sentence of death "under the influence of passion, prejudice or any other arbitrary factor," Miss. Code Ann. § 99-19-105(3)(a) (1972 & Supp. 1995), under the amended sentencing statute, juries who sentence capital offenders after July 1, 1994, will be able to consider the possibility of parole in their deliberations.[(3)] However, Wiley was sentenced in February of 1982 which brings the scope of this Court's review under the pre-amended statute. It provides that "[u]pon conviction or adjudication of guilt of a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment," and that the jury shall determine "[b]ased on these considerations, whether the defendant should be sentenced to life imprisonment or death." Miss. Code Ann. § 99-19-101(1), (2) (d) (1972) (prior to 1994 amendment) (emphasis added).

¶33. Today, the majority overrules *Blue v. State*, 1996 WL 63962 (Miss. 1996), slip op. at *6, *Mackbee v. State*, 575 So. 2d 16 (Miss. 1990), *Turner v. State*, 573 So. 2d 657, 675 (Miss. 1990), *Jessie Derrell Williams v. State*, 544 So. 2d 782 (Miss. 1987), and *Walter Williams, Jr. v. State*, 445 So. 2d 798 (Miss. 1984), *cert. denied*, 469 U.S. 1117 (1985), insofar as these cases prohibit the consideration of the possibility of parole by capital sentencing jurors. This is clearly erroneous and injects an arbitrary and unnecessary factor into the deliberations of capital sentencing jurors.

¶34. The focus of a capital sentencing jury's deliberations is to be ***whether the defendant should be allowed to live, not how long the defendant might be allowed to live in prison***. When prison terms and the possibility of parole are items considered by a capital sentencing jury, their focus is

unavoidably removed from their sole purpose - ***whether the defendant should be permitted to live***. Other considerations, like the possibility of parole, have no place in a sentencing juror's mind, and "evidence which is 'totally speculative' should be withheld from a jury deliberating the fate of a convicted defendant." ***Turner v. State***, 573 So. 2d 657, 675 (Miss. 1990). The majority asserts that jurors cannot help but consider the possibility of parole in their deliberations. This is because the jury is ignorant to, uninformed of, and improperly admonished as to their task. A capital sentencing jury should be made to truly understand that they are only to consider whether the defendant, taken with all aggravating and mitigating circumstances,[(4)] should be allowed to live. One can easily see that there is no room in this inquiry for the possibility of parole or other arbitrary factors.

¶35. In determining whether life imprisonment will be an appropriate punishment, the jury shall "have no concern with the quantum of punishment because it subverts a proper determination of the sentencing issue." ***Williams***, 445 So. 2d at 813. ***See also Blue***, 1996 WL 63962, slip op. at *6; ***Mackbee***, 575 So. 2d at 40 (quoting ***Williams***, 445 So. 2d at 813); ***Marks v. State***, 532 So. 2d 976, 983 (Miss. 1988); ***Williams***, 544 So. 2d at 796; ***Cabello v. State***, 471 So. 2d 332, 346 (Miss. 1985); ***Mhoon v. State***, 464 So. 2d 77, 83 (Miss. 1985). The reasoning behind this is:

> First, such references inevitably have the effect of inviting the jury to second guess the Legislature. The Legislature has declared that persons sentenced to life imprisonment may under certain circumstances become eligible for parole. It is no more proper for the jury to concern itself with the wisdom of that legislative determination than it is for the jury to consider the Legislature's judgment that death in the gas chamber be an authorized punishment for capital murder.
>
> Second, parole is not automatic. No person sentenced to life imprisonment has any "right" to parole. Allowing argument or testimony regarding the possibility of the defendant some day being paroled is in effect inviting the jury to speculate how ten years in the future the parole board may exercise its legislatively granted discretionary authority. This would introduce into the sentencing proceedings an "arbitrary factor" proscribed by section 99-19-105(3)(a).

***Id***. (citations omitted) (emphasis added).

¶36. In Mississippi, a sentencing jury of a capital offender may not impose a sentence of death "under the influence of passion, prejudice or any other arbitrary factor." Miss. Code Ann. § 99-19-105(3)(a) (1972 & Supp. 1995). In this context, the words passion, prejudice, and arbitrary have never been defined by this Court. While we have held that the possibility of parole is purely speculative, and therefore, an arbitrary factor, ***Blue***, 1996 WL 63962, slip op. at *6; ***Mackbee***, 575 So. 2d at 40-41; ***Williams***, 544 So. 2d at 796; ***Williams***, 445 So. 2d at 813, I would prefer to first define these terms to appropriately focus my analysis. Webster's defines them as follows:

> passion . . . **4 a :** the state of being subjected to or acted on by what is external or foreign to one's true nature; *esp*[*ecially*] **:** a state of desire or emotion that represents the influence of what is external and opposes thought and reason as the true activity of the human mind.
>
> prejudice . . . **2 a** (1) **:** preconceived judgment or opinion **:** leaning toward one side of a question from other considerations than those belonging to it **:** unreasonable predilection for or objection against something (2) **:** an opinion or leaning adverse to anything without just

grounds or before sufficient knowledge.

> arbitrary . . . **1 :** depending on choice or discretion; *specif*[*ically*] **:** determinable by decision of a judge or tribunal rather than defined by statute. . . . **2 a** (1) **:** arising from unrestrained exercise of the will, caprice, or personal preference **:** given to expressing opinions that arise thus (2) **:** selected at random or as a typical example . . . **b :** based on random or convenient selection or choice rather than on reason or nature . . . 3 a : given to willful irrational choices and demands . . . **b :** characterized by absolute power or authority."

Webster's Third New International Dictionary 1651, 1788, and 110 (1986). Black's Law Dictionary also provides some helpful definitions:

> Passion. . . . this term means any of the emotions of the mind known as rage, anger, hatred, furious resentment, or terror, rendering the mind incapable of cool reflection.

> Prejudice. A forejudgment; bias; partiality; preconceived opinion. A leaning towards one side of a cause for some reason other than a conviction of its justice.

> Arbitrary. In an unreasonable manner, as fixed or done capriciously or at pleasure. Without adequate determining principle; not founded in the nature of things; nonrational; not done or acting according to reason or judgment; depending on the will alone; absolutely in power; capriciously; tyrannical; despotic. Without fair, solid, and substantial cause; that is, without cause based upon the law; not governed by any fixed rules or standard. Willful and unreasoning action, without consideration and regard for facts and circumstances presented. Ordinarily, "arbitrary" is synonymous with bad faith or failure to exercise honest judgment and an arbitrary act would be one performed without adequate determination of principle and one not founded in nature of things.

Black's Law Dictionary 1124, 1179, and 104 (6th ed. 1990) (citations omitted). We have also deemed these terms to be descriptive of "extraneous influences." ***Pinkney v. State***, 538 So. 2d 329, 338 (Miss. 1988). With specific reference to the imposition of capital punishment, arbitrary factors are those factors that are unrelated to personal responsibility and moral guilt, Patrick M. Fahey, Note, *Payne v. Tennessee: An Eye for an Eye and Then Some*, 25 Conn. L. Rev. 205, 206 (1992), and we know that arbitrary factors have been used in sentencing a capital offender to death when "no rationally meaningful distinction could be made between those convicted of murder who received the death penalty and those murderers given lesser sentences." Charles M. Sevilla & Michael Laurence, *Thoughts on the Cause of the Present Discontents: The Death Penalty Case of Robert Alton Harris*, 40 UCLA L. Rev. 345, 350 (1992). Using these definitions and common sense, we have consistently decided that a capital sentencing jury may not consider possibility of parole in deciding whether to allow a capital offender to live within the rigid confines of Parchman or be forced to intake a lethal injection. ***Mackbee***, 575 So. 2d at 40-41; ***Williams***, 544 So. 2d at 796; ***Williams***, 445 So. 2d at 813.

¶37. The majority today overrules these cases, because they "inappropriately and erroneously make the possibility of parole an arbitrary consideration." The natural antithesis of this statement is that, under the above definitions, the possibility of parole is not "random," "synonymous with bad faith or failure to exercise honest judgment," a "leaning towards one side of a cause for some reason other than a conviction of its justice," or "unrelated to personal responsibility and moral guilt." That this is

absurd is quite the understatement.

¶38. The possibility of parole (meaning that it may or may not occur - *nobody knows*) is quite external and irrelevant in the inquiry as to whether a defendant should or should not be put to death. It is definitely a consideration outside of those the jury may lawfully consider, having such a potential impact so as to allow jurors to lean to one side or the other, and it undoubtedly arises from the unrestrained exercise of personal preference. Since the possibility of parole is therefore definitely a consideration of passion, prejudice, and arbitrariness, it should no more be a consideration in the deliberations of a capital sentencing jury than the defendant's race, gender, national origin, religious affiliation, income, mental condition, appearance, social class, or his sexual preference. Other arbitrary factors include the cost of imprisoning the defendant, *Tucker v. Zant*, 724 F.2d 882, 888 (11th Cir. 1984), potential danger to prison guards or young prisoners, allegations of crimes the defendant is not charged with, *Tucker v. Francis*, 723 F.2d 1504, 1506-07 (11th Cir. 1984), the possibility the defendant will escape, lack of security in ill-run jails, and the patriotic value of killing murderers. *Brooks v. Francis*, 716 F.2d 780, 788-90 (11th Cir. 1983). My Brother Robertson said in *Hill v. State*, 432 So. 2d 427 (Miss. 1983), that "[w]e can think of no more arbitrary factor than having nimbleness of counsel on points of procedure determine whether Alvin Hill lives or dies," *Id*. at 449. (Notice that he also framed the question correctly). Similarly I can think of no more arbitrary factor than the possibility of parole. Despite the fancy language employed by my colleagues, there is, and can be, only one logical and rational conclusion in this matter. The possibility of parole is an arbitrary factor and cannot, under the laws of this State, be considered by a capital sentencing jury in its deliberations on whether to apply the death penalty.

¶39. This Court has previously held that in capital cases, a habitual offender status hearing must be held before the sentencing hearing to determine whether the defendant qualifies as an habitual offender, disqualifying him for parole. *Turner v. State*, 573 So.2d 657, 673-75 (Miss. 1990). Then, at the sentencing hearing, the jury must be informed of the defendant's status as an habitual offender, and the jury must be instructed that as an habitual offender, the defendant is ineligible for parole. *Id*. *See also Berry v. State*, 575 So.2d 1, 13-14 (Miss. 1990); *Mackbee v. State*, 575 So.2d 16, 38-41 (Miss. 1990); *Ladner v. State*, 584 So.2d 743, 758-59 (Miss. 1991); *Russell v. State*, 607 So.2d 1107, 1118-19 (Miss. 1992); *Taylor v. State*, 672 So.2d 1246, 1272-73 (Miss. 1996). These cases involving habitual offenders are distinguishable from the present case, because it is an absolute statutory mandate that habitual offenders are not qualified for parole. Miss. Code Ann. § 99-19-83. There is nothing arbitrary about the statutory requirement that bars habitual offenders from parole eligibility. However, for first-time offenders like Wiley, it is pure speculation to consider the possibility of parole at the sentencing hearing.

¶40. Because the possibility of parole is an arbitrary factor, the majority's decision today assertively holds that an arbitrary factor may be considered by a capital sentencing jury. This is clearly erroneous and goes against the plain language of the statute which the majority, through its holding, purports to rewrite.

¶41. More importantly, the majority today ignores the doctrine of stare decisis. "[I]t is indisputable that stare decisis is a basic self-governing principle within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurisprudential system that is not based upon 'an arbitrary discretion.'" *Patterson v. McLean Credit Union*, 491 U.S. 164, 172 (1989) (citing

The Federalist, No. 78, p. 490 (H. Lodge ed. 1888) (A. Hamilton)). This doctrine and fidelity to precedent are fundamental to "a society governed by rule of law." ***Payne v. Tennessee***, 501 U.S. 808, 848 (1991) (Marshall, J., dissenting) (citing ***Akron v. Akron Center for Reproductive Health, Inc.***, 462 U.S. 416, 420 (1983)). Thus, precedent should not be departed from without "special justification." ***Arizona v. Rumsey***, 467 U.S. 203, 212 (1984).

> Such justifications include the advent of "subsequent changes or development in the law" that undermine a decision's rationale, the need "to bring [a decision] into agreement with experience and with facts newly ascertained," and a showing that a particular precedent has become a "detriment to coherence and consistency in the law."

***Payne***, 501 U.S. at 849 (Marshall, J., dissenting) (citations omitted). Thus, "[t]he real question, then, is whether today's majority has come forward with the type of extraordinary showing that this Court has historically demanded before overruling one of its precedents." ***Id***. at 848. Clearly they have not.

¶42. We have consistently held, and for good reason, that sentencing juries of capital offenders shall not consider the possibility of parole in deciding whether to execute an offender or spare his life. ***Mackbee***, 575 So. 2d at 40-41; ***Williams***, 544 So. 2d at 796; ***Williams***, 445 So. 2d at 813. We do not stand alone in this position as, of the thirty-seven other states who currently have death penalty statutes[5], twenty-seven have also held that jurors should not consider the possibility of pardon, parole, or commutation[6], and only three states have reached a conclusion to the contrary.[7] However, even the rationale of these three differing states is flawed and outdated.[8] The viewpoint adopted by most states provides an effective and necessary safeguard against the imposition of arbitrary and capricious death sentences in clear violation of the standard set forth in ***Furman v. Georgia***, 408 U.S. 238 (1972) (Per Mr. Justice Stewart with two Justices concurring and three Justices and the Chief Justice concurring in the judgment.). In ***Furman***, the justices mandated that where sentencing juries are given discretion as to whether a defendant should be put to death or not, such discretion must be limited and controlled in order to minimize the risk of the jury arbitrarily and capriciously imposing a penalty of death. ***Id***. ***See also Gregg v. Georgia***, 428 U.S. 153 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (procedures must "minimize the risk of wholly arbitrary and capricious action"); ***Stringer v. Black***, 503 U.S. 222 (1992). The majority's imposition of the possibility of parole as a relevant consideration to capital sentencing juries is clearly contrary to these guidelines. There are no recent developments or new facts (absent popular opinion) that have shown that excluding the possibility of parole from capital jurors has created an inconsistency in our capital sentencing system. If we are to follow the polls of popular opinion each time a case comes before this Court, this Court need not even sit. An anarchical system would be more appropriate. The majority's decision has reduced the doctrine of stare decisis in Mississippi to a passing phrase.

¶43. The majority's position is also unsupported by the doctrine of separation of powers in Mississippi.[9] As the foundation of ours and the federal system, the enormously overwhelming importance of this doctrine, especially in this State, must not be ignored.[10]

¶44. In this State, parole is the exclusive function of the executive branch. Since jurors (part of the judicial branch) are not able to participate in a parole hearing itself, their consideration of such in the future is not warranted. ***See People v. Ramos***, ***State v. Rollins***, ***Clark v. Tansy***, ***People v. Johnson***, and ***McKee v. State***, n. 3, *supra.* As we stated in ***Williams***, "allowing argument or testimony

regarding the possibility of the defendant some day being paroled is in effect inviting the jury to speculate how ten years in the future . . . the parole board may exercise its legislatively granted authority." *Williams*, 445 So. 2d at 813. A capital sentencing jury could also opt for the death penalty to avoid or minimize the governor's or parole board's use of their power to grant clemency or parole. As a natural result, jurors would be interfering with powers reserved exclusively for the executive branch by the Mississippi Constitution. See n. 7, *supra*. The speculation of what may or may not occur in the executive branch is quite a passionate, prejudicial, and arbitrary consideration and should not be supported by this Court. The consideration of executive clemency is especially arbitrary since it is usually based on popular opinion, political aspirations, the moral courage of the decision maker, and other factors. Daniel T. Kobil, *Due Process in Death Penalty Commutations: Life, Liberty, and the Pursuit of Clemency*, 27 U. Rich. L. Rev. 201, 226 (1993). Our adoption and encouragement of this consideration is as egregious and erroneous as our deciding a case, not by what the law is, but by what we perceive the law will be in the future, pending legislative enactments and amendments. *We know not what the future holds*. Thus, our decisions are based on the law of today and not upon groundless predictions of the future. No principle is more consistent with common sense and good judgment than this. Specifically within our own branch of government, we should not encourage decisions based on alternative and purely speculative methods of reasoning. If there were ever a violation of due process that "shocks the conscience,"[11] our support of speculative, passionate, egregious, prejudicial, erroneous, and arbitrary logic must certainly qualify.

¶45. With the greatest possible respect, I dissent.

**BANKS AND McRAE, JJ., JOIN THIS OPINION.**

## APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi,* 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), **Jones v. Mississippi**, 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

* Case was originally affirmed in this Court but on remand from U. S. Supreme Court,case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE

## <u>AND SENTENCE PHASE</u>

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State*, 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).


## DEATH CASES REVERSED AS TO GUILT PHASE

## AND SENTENCE PHASE

### (continued)

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

## DEATH CASES REVERSED

## AS TO PUNISHMENT AND REMANDED

## FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

## DEATH CASES REVERSED AS TO

## PUNISHMENT AND REMANDED FOR A NEW TRIAL

## ON SENTENCING PHASE ONLY

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

***Shell v. State***, 554 So. 2d 887 (Miss. 1989), ***Shell v. Mississippi***, 498 U.S. 1 (1990) reversing, in part, and remanding, ***Shell v. State*** 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

**Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

***Clemons v. State***, 535 So. 2d 1354 (Miss. 1988), ***Clemons v. Mississippi***, 494 U.S. 738 (1990) vacating and remanding, ***Clemons v. State***, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

***Jones v. State***, 517 So. 2d 1295 (Miss. 1987), ***Jones v. Mississippi,*** 487 U.S. 1230 (1988) vacating and remanding, ***Jones v. State***, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* --- So. 2d --- (Miss. 1996)

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).


# DEATH CASES REVERSED AS TO

# PUNISHMENT AND REMANDED FOR A NEW TRIAL

# <u>ON SENTENCING PHASE ONLY</u>

### <u>(continued)</u>

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.


1. Miss. Code Ann. § 99-19-105(3)(a) provides that, in capital murder cases, this Court should determine whether "the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor."

2. The sentencing statute in effect at that time provided that a capital murder sentencing jury could sentence the defendant to life or death. That statute has subsequently been amended to provide that a sentencing jury may consider life, life without parole, or death. *See* Miss. Code Ann. § 97-3-19, as amended in 1994.

3. Section 99-19-101 has since been amended and now reads as follows:

> (1) Upon conviction or adjudication of guilt of a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment. . . .

> (2) After hearing all the evidence, the jury shall deliberate on the following matters:

> . . .

> (d) Based on these considerations, whether the defendant should be sentenced to life imprisonment, life imprisonment without eligibility for parole, or death.

Miss. Code Ann. § 99-19-101 (Rev. 1994).

4. Aggravating and mitigating circumstances are an important part of the death penalty procedure. Section 99-19-101 provides, in part:

> (1) . . . In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the <u>aggravating or mitigating circumstances</u>. . . .

> (2) After hearing all the evidence, the jury shall deliberate on the following matters:

> (a) Whether sufficient <u>aggravating circumstances</u> exist . . ..

> (b) Whether sufficient <u>mitigating circumstances</u> exist . . ., which outweigh the <u>aggravating circumstances</u> found to exist . . ..

> (3) For the jury to impose a sentence of death, it must unanimously find in writing the following:

> (b) That sufficient <u>aggravating circumstances</u> exist . . ..

> (c) That there are insufficient <u>mitigating circumstances</u> . . ., to outweigh the <u>aggravating circumstances</u>.

Miss. Code. Ann § 99-19-101 (Rev. 1994) (emphasis added).

5. Alabama, Arkansas, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Missouri, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, New York, Nevada, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming.

6. *Pilley v. State*, 247 Ala. 523, 528, 25 So. 2d 57, 60 (1946) (The jury "should decide the case on the evidence presented to them and should not be concerned with any future action which might be taken by appellate courts or pardoning authorities."); *Westbrook v. State*, 265 Ark. 736, 747, 580 S.W.2d 702, 708, (1979) (It is "prejudicial error when a trial judge discussed the matter of possible parole with the jury, in response to the question of a juror."); *People v. Ramos*, 37 Cal.3d 136, 158, 207 Cal.Rptr. 800, 813-14, 689 P.2d 430, 442-44 (1984) ("By drawing the jury's attention to the Governor's commutation power, the instruction invites the jury to second-guess a future Governor's exercise of his constitutional authority and to impose a harsher sentence than it might otherwise impose simply out of fear that the Governor and the parole authorities will make a mistake and will release the defendant while he is still dangerous. To permit a jury to act in this fashion is inconsistent with a defendant's right under the California Constitution to have the commutation decision made by the Governor and undermines the fairness of the jury's determination."); *Sukle v. People*, 107 Colo. 269, 273, 111 P.2d 233, 235 (1941) ("We think the subject of the jury's inquiry [whether the defendant would be eligible for parole] was not of their proper concern, and the court's advice thereon, even with the consent of counsel, was highly improper."); *Smith v. State*, 317 A.2d 20, 25-26 (Del. 1974) ("Basically, at least two evils may occur as a result of an instruction concerning possible pardon, parole or probation. First, such comment to a jury may 'becloud the issue before them and open the way to a compromise verdict.' (citation omitted) . . . Second, relying upon the possibility of parole, probation or the like, a jury may be tempted to compensate for what it considers future leniency or release, and deal with the case more severely than it might otherwise. . . . We hold that it is impermissible for a jury to consider and attempt to evaluate the uncertain effects of potential post-conviction remedies. Such conjecture is not within the traditional perimeters of a jury's function and has no place in our system of justice in this State."); *Paramore v. State*, 229 So.2d 855, 860 (Fla. 1969) ("The statement of the prosecutor in closing argument that a life sentence is not inviolate is an improper argument . . .."); *Fleming v. State*, 240 Ga. 142, 146, 240 S.E.2d 37, 40 (1977) ("The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence by making predictions of the consequences of the jury's verdict."); *People v. Walker*, 91 Ill. 2d 502, 515, 64 Ill.Dec. 531, 536-38, 440 N.E.2d 83, 89-90 (1982) ("By injecting the parole consideration into the penalty determination, the jury is diverting its attention from the offense and the offender, and is focusing upon a speculative possibility that may or may not occur. . . . Whether or not the defendant may, at some future time, be paroled is not a proper aggravating factor to consider in determining whether the death penalty should be imposed."); *Farmer v. Commonwealth*, 450 S.W.2d 494, 494-95 (Ky. 1970) ("We agree that probation and parole should not be mentioned to the jury at any time, in general or otherwise, except in response to an inquiry from the jurors, in which instance it is unavoidable and should be confined to an admonition that it is not a matter for the jury to consider, that the jury must base its verdict solely on the evidence and instructions."); *State v. Kirkpatrick*, 443 So. 2d 546, 559 (La. 1983) ("It is well settled that an instruction or comment to the jury making mention of commutation or parole possibilities on a life sentence in a capital case introduces arbitrary factors which divert the jury from their primary responsibility. Therefore, such instructions or comments are improper."), *cert. denied*, 466 U.S. 993 (1984); *Poole v. State*, 295 Md. 167, 197, 453 A.2d 1218, 1233 (1983) ("Any consideration of the possibility of parole as such simply is irrelevant and obviously prejudicial; we cannot condone such argument."); *State v. Rollins*, 449 S.W.2d 585, 591 (Mo. 1970) ("'[I]t is error for the trial court to inform the jury that the sentence imposed by its verdict may be diminished by parole or some similar procedure not administered by

the judicial branch of government.' (citation omitted) . . . The question of future clemency is extraneous to a proper determination of issues of guilt and punishment by the jury. It should be of no concern to them."); ***Grandsinger v. State***, 161 Neb. 419, 448, 73 N.W.2d 632, 651 (1955) ("'In the event the decision was for life imprisonment, whether or not he should be later paroled or pardoned was not a matter for it to decide. The jury's task at that point was to choose between one or the other of the penalties. That decision should not rest upon whether parole was easy or difficult to secure.'" (citation omitted)); ***State v. White***, 27 N.J. 158, 178, 142 A.2d 65, 76-77 (1958) ("Logically, the jury should be told simply that the subject of parole must not be considered by it."); ***Clark v. Tansy***, 882 P.2d 527, 534 (N.M. 1994) ("Allowing the jury to speculate about *possible* future executive or legislative actions cannot be reconciled with the requirement that the jury's sentencing discretion be limited and directed or the requirement that the jury have accurate information about the sentencing alternatives it is to consider."); ***People v. Johnson***, 284 N.Y. 182, 188, 30 N.E.2d 465, 467 (1940) ("The jury has nothing to do with appeals and applications for clemency. They lie in a wholly different field. The jurors have task enough to find the truth and proclaim it by their determination without regard to ultimate consequences. Nothing can be permitted to weaken the jurors' sense of obligation in the performance of their duties."); ***Serrano v. State***, 84 Nev. 676, 680, 447 P.2d 497, 499 (1968) ("'[E]ligibility for parole begins when a minimum of ten years has been served. That's the only thing I can tell you.' The reference to ten years was in error . . ..."); ***State v. Jones***, 296 N.C. 495, 502-03, 251 S.E.2d 425, 429 (1979) ("The jury's sentence recommendation should be based solely on their balancing of the aggravating and mitigating factors before them. The possibility of parole is not such a factor, and it has no place in the jury's recommendation of the sentence to be imposed."); ***McKee v. State***, 576 P.2d 302, 305-06 (Okla. Crim. App. 1978) ("'The law does not make it any part of the jury's province to speculate on the defendant's conduct in the penitentiary, and the awards of grace he may receive because of good behavior. In fact, the jury's role is that of an arm of the judicial branch of the government, and the incarceration of a convict is one of administration for an arm of the executive branch of the government. To permit the jury to project itself in this manner into the executive branch of the government is clearly contrary to our constitutional concept of division of powers.'" (citation omitted)); ***State v. Leland***, 190 Or. 598, 623, 227 P.2d 785, 796 (1951) ("[T]he jury's choice is between capital punishment and a sentence of life imprisonment. The possibility of pardon or parole, purely speculative, should not enter into the jury's deliberations, and was irrelevant on the voir dire examination."), *aff'd*, 343 U.S. 790 (1952); ***Commonwealth v. Aljoe***, 420 Pa. 198, 208, 216 A.2d 50, 55-56 (1966) (When questions regarding the possibility of parole "are asked spontaneously by the jury, the Court should refuse to answer them."); ***State v. Goolsby***, 275 S.C. 110, 124-25, 268 S.E.2d 31, 39 (1980) ("[A] jury charged with assessing, or recommending, the penalty an accused is to suffer should not be invited to consider the effect of parole on the sentence to be imposed, not be allowed to speculate upon parole eligibility when determining the guilt or innocence of a criminal defendant." (citations omitted)), *cert. denied*, 449 U.S. 1037 (1980), *overruled on other grounds by*, ***State v. Torrence***, 406 S.E.2d 315, 329 (S.C. 1991); ***Farris v. State***, 535 S.W.2d 608, 614 (Tenn. 1976) ("Jurors should not be permitted to speculate on the length of sentences, discretionary parole, the accumulation of good and honor time and a whole conglomeration of contingent events which, if they come to pass at all, will come to pass in the future."); ***Clanton v. State***, 528 S.W.2d 250, 252-54 (Tex. Crim. App. 1975) ("[A] jury . . . is not authorized to consider or apply the parole law in assessing punishment."); ***Jones v. Commonwealth***, 194 Va. 273, 278, 72 S.E.2d 693, 696-97 (1952) ("But that jury, or any other, should not fix a defendant's punishment with the view of preventing the operation of laws that have

been duly enacted for the handling of a prisoner after sentence in a way considered by the lawmakers to be in the best interests of the public and of the prisoner."); *State v. Todd*, 78 Wash.2d 362, 376-77, 474 P.2d 542, 551 (1970) ("By instructing the jury concerning the possible minimum sentence which the defendant might serve, the court suggests to the jury that it should give great weight to that possibility in reaching its verdict." Since it appears that the jury did give considerable weight to that factor, such instruction was prejudicial error.); *State v. Carroll*, 52 Wyo. 29, 85, 69 P.2d 542, 564 (1937) ("[Trial judges] should tell the jury that they should not speculate upon what might happen after the verdict, so that no possible ground may be left for a claim that the fullest measure of protection has not been extended to the accused. . ..."). Connecticut, Idaho, Kansas, Montana, New Hampshire, South Dakota, and Utah have yet to speak on this issue.

7. Ohio (*Massa v. State*, 37 Ohio App. 532, 538-39, 175 N.E. 219, 221-222 (1930)), Arizona (*State v. Coey*, 82 Ariz. 133, 137, 309 P.2d 260, 262-63 (1957)), and Indiana (*Brewer v. State*, 275 Ind. 338, 371-73, 417 N.E.2d 889, 908-09 (1981)).

8. Arizona's rule in *State v. Coey*, n. 4, *supra*, is obviously flawed and has not been found in Arizona case law since 1967. That the holding in *Coey* is in 1957, well before *Furman* banned the consideration of arbitrary and capricious factors, is surely the reasoning behind its non-use in Arizona in the last 29 years. This same rationale also applies to Ohio's rule in *Massa v. State*, n. 4, *supra*, which was handed down in 1930 and has not been cited, even once, since.

Ohio's rule in *Massa*, and Indiana's rule in *Brewer v. State*, n. 4, *supra*, should not be persuasive to us because Ohio and Indiana's death penalty statutes allow the jury to choose between death and life imprisonment without parole. *Massa*, 175 N.E. at 221; Ind. Code Ann. § 35-50-2-9(e) (Burns 1994 & Supp 1996). Because, under the statutes of these States, the defendant may not receive parole, the jury's consideration of such is absolutely irrelevant.

Some of these distinctions are also articulated in Justice Marshall's dissent in *California v. Ramos*, 463 U.S. 992, 1026-27 (1983) (Marshall, J., dissenting).

9. The State of Mississippi Constitution provides for the separation of powers in Mississippi as follows:

> The powers of the government of the state of Mississippi shall be divided into three distinct departments, and each of them confided to a separate magistracy, to-wit: those which are legislative to one, those which are judicial to another, and those which are executive to another.

> No person or collection of persons, being one or belonging to one of these departments, shall exercise any power properly belonging to either of the others. The acceptance of an office in either of said departments shall, of itself, and at once, vacate any and all offices held by the person so accepting in either of the other departments.

Miss. Const. art 1, §§ 1, 2 (1972).

10. As I made clear in *Dye v. State Ex Rel. Hale*, 507 So. 2d 332 (Miss. 1987), the doctrine of separation of powers in Mississippi is very important. I stated:

> The founders of this nation recognized in the federal system the absolute necessity for the

separation of powers of the different departments of government. In his farewell address George Washington warned, "The spirit of encroachment tends to consolidate the powers of all of the departments in one, thus to create, whatever the form of government, a real despotism." John Adams said, "It is by balancing each of these three powers against the other two, that the efforts and human nature toward tyranny can alone be checked and restrained, and any degree of freedom preserved in the Constitution." James Madison, considered the father of the Constitution, emphasized, "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." Such was the importance placed upon the political doctrine of separation of powers by the founders of this country. The Mississippi Constitution of 1890 evinces the same concern, but carries it one significant step further.

Unlike its federal counterpart, the state concept of Separation of Powers was made a rule of constitutional law in Mississippi and is not merely a political doctrine. Article I of the State Constitution states the primary and overriding ethic of government imposed upon us by the Constitution of 1890. The Draconian nature of the penalty for violating this prime governmental ethic leaves no doubt that the separation of powers is a constitutional commandment of foremost importance. It is not merely a political suggestion to be ignored as convenience dictates.

This Court has already stated this obvious precept of Mississippi Constitutional Law when speaking through Chief Justice Patterson in *Alexander v. State, ex rel Allain*, 441 So. 2d 1329, 1335 (Miss. 1983):

We must conclude the intention of the draftsmen was that there be no exceptions to the mandates that the powers of government be held and exercised in three separate and distinct departments and that no person holding office in any one department should have or exercise any power properly belonging to either of the others.

I cannot agree with the majority when it characterizes these powerful words as dicta. This significant language lies at the vital center of the *Alexander* decision and illuminates with pristine clarity the central concept of the homogeneous Constitution of Mississippi. There can be no exception to the separation of power mandates and no person holding office in one department shall exercise *any power properly belonging* to either of the other departments of government.

*Dye v. State Ex Rel. Hale*, 507 So. 2d 332, 353 (Miss. 1987) (Sullivan, J., concurring in part and dissenting in part) (citations omitted).

11. *Rochin v. People of California*, 342 U.S. 165, 172 (1952) ("Applying these general considerations to the circumstances of the present case, we are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combating crime too energetically. This is conduct that shocks the conscience.")