## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 1998-DP-01782-SCT

*BLAYDE GRAYSON a/k/a BLAYDE N. GRAYSON a/k/a BLAYDE NATHANIEL GRAYSON a/k/a BLAYDE N. AMODEO*

*v.*

*STATE OF MISSISSIPPI*

MARVIN L. WHITE, JR.

| | |
|---|---|
| DATE OF JUDGMENT: | 08/08/1997 |
| TRIAL JUDGE: | HON. KATHY KING JACKSON |
| COURT FROM WHICH APPEALED: | GEORGE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DAVID MICHAEL ISHEE |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: |
| DISTRICT ATTORNEY: | DALE HARKEY |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 11/08/2001 |
| MOTION FOR REHEARING FILED: | 11/20/2001; denied 2/7/2002 |
| MANDATE ISSUED: | 2/14/2002 |

**EN BANC.**

**COBB, JUSTICE, FOR THE COURT:**

¶1. Blayde Grayson was indicted in the George County Circuit Court for capital murder, pursuant to Miss. Code Ann. § 97-3-19(2)(e) (2000), while in the commission of the crime and felony of burglary as defined by Miss. Code Ann. § 97-17-23 (2000). He was later convicted and sentenced to death by lethal injection. He now appeals, raising the following seven issues:

**I. THE TRIAL COURT ERRED IN FAILING TO GRANT THE APPELLANT'S MOTION TO SUPPRESS STATEMENTS GIVEN TO LAW ENFORCEMENT OFFICERS.**

**II. THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR CHANGE OF VENUE.**

**III. THE TRIAL COURT ERRED IN ALLOWING THE INTRODUCTION OF PHOTOGRAPHS OF THE VICTIM AND OF THE CRIME SCENE INTO EVIDENCE.**

**IV. THE TRIAL COURT ERRED IN FAILING TO GRANT THE APPELLANT'S MOTION TO DECLARE MISSISSIPPI CODE SECTION 97-3-19(e) UNCONSTITUTIONAL OR IN THE ALTERNATIVE TO PRECLUDE THE PROSECUTION FROM RELYING ON MISSISSIPPI CODE ANNOTATED SECTION 99-19-101 5(d) AS AN AGGRAVATING CIRCUMSTANCE OF THE APPELLANT'S**

**POSSIBLE CAPITAL SENTENCE TRIAL.**

**V. THE TRIAL COURT ERRED IN NOT GRANTING THE APPELLANT'S MOTION FOR MISTRIAL BASED ON COMMENTS MADE BY POTENTIAL JURORS DURING VOIR DIRE.**

**VI. THE TRIAL COURT ERRED IN STRIKING JURORS BRIDGET PHILLIPS AND BERNARD GOFF WITHOUT PROPER SHOWING THAT THE POTENTIAL JURORS COULD NOT FOLLOW THE LAW IN REGARD TO THE DEATH PENALTY.**

**VII. THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S MOTION FOR FUNDS FOR PRIVATE INVESTIGATOR AND JURY CONSULTANT DESPITE REPEATED REQUESTS BY THE APPELLANT.**

¶2. Finding these issues to be without merit, we affirm.

## FACTS

¶3. On May 5, 1996, the body of seventy-eight-year-old Minnie Smith was discovered by her son-in-law. The police investigation revealed that Smith had been stabbed to death, apparently in the course of a burglary of her home. Law enforcement officers interviewed neighbors within a radius of several miles, before eventually focusing their attention on Blayde Grayson.

¶4. On March 23, 1995, Grayson had pled guilty to grand larceny and to the reduced charge of knowingly receiving stolen property in connection with burglaries apparently committed in the area of the Smith home. He was sentenced to two three-year terms to be served concurrently and transferred to the Mississippi Department of Corrections (MDOC) Restitution Center Program in neighboring Jackson County, with the understanding that a failure to complete the program would result in his being placed in the general MDOC population without any further orders from the court. According to documents filed with the court, Grayson later walked off of a work detail, and a warrant was issued for his arrest on January 19, 1996, for probation violation.

¶5. Soon after the murder, Sheriff George Miller of George County contacted law enforcement officials in Florida in an attempt to locate Grayson.[1] Miller soon learned that law enforcement officials in Escambia County, Florida, were also seeking Grayson in connection with three armed robberies committed in Florida in May of 1996. Sheriff Miller later indicated that Grayson became a suspect because of his prior crimes and because his home prior to incarceration was "a very short distance" from Minnie Smith's home. On May 17, 1996, the Escambia County sheriff's department called Miller to inform him that Grayson was in custody. Sheriff Miller traveled to Florida that afternoon, accompanied by Houston Door and John Miller of the Mississippi Highway Patrol and Chief Investigator Al Hillman of the George County sheriff's office. When Sheriff Miller arrived in Escambia County, he began interviewing Grayson,[2] after having him sign a waiver of his Miranda rights. Although he had earlier requested to speak with law enforcement personnel from George County, Grayson apparently changed his mind after Sheriff Miller began the interview. The transcript of the hearing on the motion to suppress Grayson's confession contains the following exchange:

Q. [W]ould you read the line stated by Mr. Blayde Grayson, sir? It begins "no, sir".[3]

A. "No, sir, I'd rather not until I talk to my lawyer."

Q. All right. Now, that is about - what - about a quarter of the way into the interview?

A. Yes, sir.

Q. And he tells you at that point he wants to talk to his lawyer?

A. Yes, sir.

Q. All right. Now did you continue to question him after that, Sheriff?

A. Yes, sir.

Q. All right . . . . answered, "no, sir, not really" and what was your response to that, Sheriff?

A. Okay. The Sheriff from Escambia County, you were wanting to talk to us. [sic] We're over here to talk with you.

Q. And Mr. Grayson's response is, "I was going to deal with you all when I got down there and got my lawyer". Is that correct?

A. That's correct.

Q. And what is your response to that, Sheriff?

A. Sheriff - - this is a situation were you going to - -

Q. Just on the green part is where I've highlighted where you are speaking, Sheriff.

A. "We need to establish where you were at - you're not willing to risk that. We need" -

Q. At that point Mr. Grayson responds, does he not, "I'm not willing to discuss nothing until I've talked to my lawyer. I didn't mean to bring you fellows all the way down here for nothing - now you know all the way down here - but I need to talk to my lawyer about this - this is a situation". What is your response to that, Sheriff?

A. "This is a situation where you are going to confirm with him before you talk to us about the matter? That is correct".

Q. Mr. Grayson's response is "yes, sir"?

A. Sheriff - "you have not been in George County, is that correct"?

Q. And Mr. Grayson's response is "no, sir".

A. "Have you got witnesses to that, is that correct?"

Q. And Mr. Grayson's response is "yes, sir".

¶6. At that point, the State interrupted the line of questioning, and after some discussion, Grayson simply offered the transcript into evidence. In later testimony, Sheriff Miller basically conceded that Grayson asked for a lawyer four times in the space of about four minutes before the interview ended.

¶7. The Florida interview ended on the night of May 17, 1996, and then Sheriff Miller transported Grayson back to George County that same night. On Monday, May 20, Miller sought and received an order signed by Judge Ronnie Wilkerson to obtain blood and tissue samples from Grayson.[(4)] On Tuesday, May 21, Grayson (according to the testimony of Officer James Tanner) requested to speak with Sheriff Miller. Grayson gave a statement to Miller in which he admitted being at the scene of the crime but claimed that an individual named Jason Kilpatrick actually robbed and killed Smith. Later that afternoon, Grayson accompanied Sheriff Miller and Officer Tanner back to Florida to retrieve a checkbook taken from Smith's home that had been left in the trailer Grayson shared with Kilpatrick, which Grayson claimed implicated Kilpatrick.

¶8. On Thursday, May 23, Grayson repeated his accusations against Kilpatrick in a written statement given during an interview with Sheriff Miller and Inspector Dorr. According to the testimony of Miller and Dorr, this interview was initiated by Grayson. At the conclusion of this interview, Grayson agreed to take a polygraph test. That test took place on Friday, May 24, in Jackson. After the polygraph examiner indicated that Grayson failed the test and accused him of lying, Grayson admitted to killing Smith while robbing her home. Grayson later repeated that confession to Dorr and on videotape. The confession was admitted at trial, and Grayson was convicted on August 7, 1996, and sentenced to death by lethal injection.

## ANALYSIS

### I. SHOULD THE TRIAL COURT HAVE SUPPRESSED GRAYSON'S INCRIMINATING STATEMENTS TO THE POLICE?

¶9. Grayson's first assignment of error is that his confession should have been suppressed at trial, because he was denied his right to counsel guaranteed by the Fifth and Sixth Amendments of the U.S. Constitution and Article 3, Section 26 of the Mississippi Constitution or in the alternative, because the confession was involuntary.

¶10. The Sixth Amendment guarantees that "in all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The Supreme Court has held that a criminal prosecution, for Sixth Amendment purposes, begins with the initiation of "adversary judicial proceedings." *Kirby v. Ill.*, 406 U.S. 682, 688, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). The Fifth Amendment does not expressly grant a right to counsel, but it does guarantee a right against self-incrimination, and the Supreme Court has held this right to be violated where a suspect is not apprised of his right to an attorney upon a custodial arrest. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1965).

¶11. When a suspect invokes his right to counsel, all interrogation must cease until the lawyer is present, unless the suspect himself reinitiates communication with the police. *Edwards v. Arizona*, 451 U.S. 477, 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The Supreme Court in *Edwards* stated that:

> when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. [An accused], having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further

communication, exchanges, or conversations with the police.

*Edwards*, 451 U.S. at 484. Such an invocation must be unambiguous; however, an ambiguous mention of possibly speaking with one's attorney is insufficient to trigger the right to counsel. ***Davis v. United States***, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)(holding that statement of "Maybe I should talk to a lawyer" was insufficient to trigger right to counsel).

¶12. In addition to these rights guaranteed by the U.S. Constitution, the Mississippi Constitution also states that "[i]n all criminal prosecutions the accused . . . shall not be compelled to give evidence against himself." Miss. Const. art. 3, § 26. We have construed this provision to be congruent with the right to counsel guaranteed by the Sixth Amendment of the U.S. Constitution, except for the fact that it attaches earlier: A person's § 26 rights attach when the police move from an investigatory phase to an accusatory phase, rather than at the actual start of adversary proceedings. ***Williamson v. State***, 512 So.2d 868, 876 (Miss. 1987). Thus, a suspect has a right to an attorney at the time of his arrest, regardless of whether he has been arraigned or has otherwise triggered his Sixth Amendment rights. ***Williamson***, 512 So.2d at 876. As with the federal rules, when a suspect has invoked his right to counsel, interrogation must cease unless the suspect himself voluntarily reinitiates communication. ***Mettetal v. State***, 602 So.2d 864, 868 (Miss. 1992).

¶13. Where a suspect voluntarily initiates contact with police, he effectively waives both his Fifth and Sixth Amendment rights. ***Genry v. State***, 735 So.2d 186, 196 (Miss. 1999). When a suspect voluntarily signs a waiver form, he waives his right to have an attorney present during questioning. ***Saucier v. State***, 562 So.2d 1238, 1244 (Miss. 1990)(upholding validity of voluntarily signed waiver-of-rights form). While a signed waiver form satisfies the requirement that a waiver of rights be knowing and intelligent, any statements given can still be attacked on the grounds that they were involuntary. ***Abram v. State***, 606 So.2d 1015, 1034 (Miss. 1992)(holding that coerced confession renders otherwise valid waiver of rights forms to be ineffective). A trial court's finding that a confession is voluntary and admissible is a finding of fact which will not be reversed unless it is manifestly in error or against the overwhelming weight of the evidence. ***Foster v. State***, 639 So.2d 1263, 1281 (Miss. 1994). Grayson argues that his rights under the Fifth and Sixth Amendments and under § 26 were violated in order to secure his confession. In particular, he argues that his Sixth Amendment and § 26 rights had attached, even though he had not been arrested for or charged with the murder of Minnie Smith at the time the statements were made, apparently on the theory that he was entitled to be arrested at some point prior to his statements because the police moved from an investigatory posture to an accusatory posture during the course of his confinement.

¶14. As a threshold matter, Grayson's claim fails because he clearly waived any right to an attorney he might theoretically have had at the time he confessed. The trial court judge made an express finding in the record of the following facts: that the police ceased their interrogation of Grayson when he invoked his right to counsel, that Grayson himself reinitiated communication with the authorities, and that Grayson signed a waiver of his rights prior to giving his statement. Since there is no evidence that these findings were clearly erroneous, Grayson is not entitled to have his statement suppressed unless he can show that it was the product of coercion.

¶15. Grayson cites a number of factors surrounding his confinement which he says were sufficient to overcome his free will and render his confession involuntary, including: (1) the fact that he had to invoke his right to counsel four times before the police would terminate their first interrogation; (2) his being subjected to "jail watch," which he says consists of law enforcement officials "checking on" him every fifteen minutes,

even during the night, resulting in sleep deprivation; (3) confinement for seven days without receiving an initial appearance or having counsel appointed; (4) being persuaded to take a polygraph test; and (5) being told that he failed the polygraph test and that it would "be better on [him] if he admitted to the charge."

¶16. The trial record does not support Grayson's interpretation of the facts or their legal significance. First, the Florida interrogation by Sheriff Miller, by Grayson's own estimate, lasted less than four minutes and elicited no information that was offered at trial. While George County law enforcement officials did testify that Grayson was put on "jail watch," Grayson has offered no evidence that merely being under observation (even at fifteen minute intervals) had any coercive effect, nor any evidence that he actually suffered sleep deprivation as a result of being under jail watch, in spite of an opportunity to cross-examine the officer responsible for performing the jail watch. Officer James Tanner gave the following illuminating testimony on this issue:

Q. One last question, Deputy Tanner. What is the procedure - I think you referred to it as the jail watch - how often do you check in on prisoners - a couple of times an hour?

A. Okay. On night shift, once an hour; on the day shift, if we have someone in the jail that has some kind of a problem, like a mental problem, mental patient or someone we want to keep an on to make sure they don't do harm to theirselves there is jail watch [sic]. It could be every 15 minutes, it could be every 30 minutes, every hour.

Q. But it's at least once an hour, maybe four times an hour?

A. Yes, sir.

Q. All right. During the time you come in and check on them, do you just look in the door to make sure they're there or do you walk over and talk to them to make sure that they're coherent and conscious?

A. We look in on them. If they are moving around, we know they're all right. We leave them alone. If they're asleep we might wake them up, especially in the daytime we make sure they're there.

¶17. This testimony - virtually the only testimony offered to describe jail watch - does not, in our opinion, demonstrate a coercive tactic likely to have overcome Grayson's freewill resulting in an involuntary confession.

¶18. Grayson's confinement was also proper, because he had violated conditions of his probation. He was under sentence to a restitution center program when he walked away from a work detail several months earlier. The sentencing order in his prior conviction says: "IT IS RECOMMENDED that if the defendant should fail to successfully complete the Restitution Center Program, the Commissioner of the Mississippi Department of Correction may without further order of this Court place the Defendant in the general population to complete said sentence." Consequently, Grayson was automatically subject to MDOC confinement without the necessity of an initial appearance or the appointment of counsel, and Grayson conceded at trial that return to the Restitution Center or placement in the George County Jail would have been equally proper. *See **Babbitt v. State**,* 755 So.2d 406, 409-10 (Miss. 2000)(affirming MDOC assertion of jurisdiction over probation violators without intervention of court).

¶19. Grayson has not offered any evidence that police used coercive tactics to induce him to take the

polygraph test, and Grayson's assertion that he was told it would be better for him to admit the charges is not supported by any testimony in the record. The polygraph examiner testified that he told Grayson "Blayde, you are not being truthful with me. I need you to talk about it." Inspector Dorr testified that he only tried to get Grayson to describe the crime fully, and he expressly denied telling Grayson that it would be better for him to confess. There is no evidence before us supporting any charge of inducement under the meaning of *Abram v. State*. The trial court's refusal to suppress the statement was not manifest error.

## II. THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR CHANGE OF VENUE.

¶20. A trial court's decision as to whether or not to grant a change of venue is reviewed for abuse of discretion. *Evans v. State*, 725 So.2d 613, 646-47 (Miss. 1997). This discretion is not unfettered, however. Pursuant to Miss. Code Ann. § 99-15-35 (2000), a defendant who files a proper application for a change of venue which is supported by two or more affidavits stating that the defendant cannot receive a fair and impartial trial in that particular county is entitled to a presumption that an impartial jury cannot be obtained. *Evans*, 725 So.2d at 647. However, this presumption can be rebutted by the State's presentation of evidence at the venue hearing "coupled with the trial judge's reasoned . . . sense of the community and, particularly in a case such as this [capital murder], an awareness of the uncontrovertible impact of saturation media publicity upon the attitudes of a community." *Gray v. State*, 728 So.2d 36, 65 (Miss. 1998)(citing *Fisher v. State*, 481 So.2d 203, 215 (Miss.1985)). In some circumstances, the defendant may be entitled to an irrebuttable presumption that an impartial jury cannot be obtained. *Evans*, 725 So.2d at 647. Elements which should serve to indicate an irrebuttable presumption include:

> (1) Capital cases based on consideration of a heightened standard of review;
>
> (2) Crowds threatening violence toward the accused;
>
> (3) An inordinate amount of media coverage, particularly in cases of
>
> (a) serious crimes against influential families;
>
> (b) serious crimes against public officials;
>
> (c) serial crimes;
>
> (d) crimes committed by a black defendant upon a white victim;
>
> (e) where there is inexperienced trial counsel.

*Id.* (citing *White v. State*, 495 So.2d 1346, 1349 (Miss. 1980). In any case, the prosecution can also rebut such claims by demonstrating that the impaneled jury members affirmatively stated that they could fairly and impartially serve as jurors. *Gray v. State*, 728 So.2d at 65-66 (affirming capital conviction of black defendant accused of killing white victim in absence of any "intensely prejudicial pretrial publicity").

¶21. The record reflects that Grayson failed to procure the affidavits required by § 99-15-35, but the prosecution waived the necessity of the affidavits. Grayson also presented four local newspaper articles about the murder which were published approximately ten months before the trial began. In response, the State called ten George County residents as witnesses, each of whom had already been subpoenaed to

appear as jurors. The ten witnesses were apparently chosen at random through the same procedures by which George County selected veniremen for jury pools. The witnesses were then asked questions by both the prosecutor and the defense counsel regarding their knowledge of the parties and of the case.

¶22. Grayson asserts that the testimony of those witnesses reveals that a majority of them either believed that he could not get a fair trial or else had already determined his guilt. The record reflects, however, that only one juror (who knew the victim personally) believed that Grayson would be unable to get a fair trial while another admitted to hearing pro-death penalty comments in connection with the case. Most of the witnesses were unable to recall details of the crime, and none were able to recall significant details of any media coverage of the crime.

¶23. At the conclusion of the voir dire, the trial court again denied Grayson's motion to change venue and commented on the relatively small number of veniremen (most of whom knew either the victim or the defendant) who expressed any knowledge of the crime. While this case is a capital case based on consideration of a heightened standard of review, that is the only *Evans* factor implicated in this case. In light of that fact, and the absence of any persuasive proof of overly prejudicial pretrial publicity, the trial court did not abuse its discretion in denying Grayson's motion to change venue.

### III. THE TRIAL COURT ERRED IN ALLOWING THE INTRODUCTION OF PHOTOGRAPHS OF THE VICTIM AND OF THE CRIME SCENE INTO EVIDENCE.

¶24. The admissibility of photographs rests within the sound discretion of the trial judge. *Griffin v. State*, 557 So.2d 542, 549 (Miss.1990). Photographs have evidentiary value where they aid in describing the circumstances of the killing and the corpus delicti, where they describe the location of the body and cause of death, and where they supplement or clarify witness testimony. *Westbrook v. State*, 658 So.2d 847, 849 (Miss. 1995)(citing *Williams v. State*, 354 So.2d 266 (Miss.1978); *Ashley v. State*, 423 So.2d 1311 (Miss.1982); *Hughes v. State*, 401 So.2d 1100 (Miss.1981)). In *Westbrook*, this Court rejected the idea that crime scene photographs, even gruesome ones, were irrelevant and inadmissible when the identity of the victim and the fact that the crime had occurred were undisputed. *Westbrook*, 658 So.2d at 850.

¶25. The pictures here were offered to corroborate the testimony of other prosecution witnesses, as well as to show the cause of death and the state of the crime scene at the time the investigation took place. Under the circumstances, the trial court did not abuse its discretion in admitting them into evidence.

### IV. THE TRIAL COURT ERRED IN FAILING TO GRANT THE APPELLANT'S MOTION TO DECLARE MISSISSIPPI CODE SECTION 97-3-19(e) UNCONSTITUTIONAL OR IN THE ALTERNATIVE TO PRECLUDE THE PROSECUTION FROM RELYING ON MISSISSIPPI CODE ANNOTATED SECTION 99-19-101 5(d) AS AN AGGRAVATING CIRCUMSTANCE OF THE APPELLANT'S POSSIBLE CAPITAL SENTENCE TRIAL.

¶26. Grayson next argues that Mississippi's death penalty statute is itself unconstitutional under the standard articulated by the U.S. Supreme Court in *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L.Ed.2d 346 (1972). There, the Supreme Court held that the death penalty may only be constitutionally imposed where the sentencing body's discretion is directed and limited in such as way as to avoid arbitrary and capricious executions. *Furman*, 408 U.S. at 257 (Douglas, J., concurring). In other words, a death

sentence must not be excessive in relation to the crime for which it is imposed, and death sentences must be imposed with reasonable consistency. *Gregg v. Georgia*, 428 U.S. 153, 187-88, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Grayson argues that applying the death penalty to all defendants who are guilty of felony murder violates this standard because doing so ignores the mental state of the defendant and because there is no rational or historical basis for treating a felony murderer as more culpable than a "depraved heart" murderer.

¶27. We have previously rejected this argument with reasoning best articulated as follows:

> All states have endorsed the common-law concept of felony murder in some form. In it the felon is considered "at risk" while committing the felony so that if a homicide results, it is considered murder, or, as in our state, capital murder if associated with the felonies, designated by the legislature. The legislature's intent was to protect the citizenry from the evil of the lesser felony by imposing a greater penalty upon a homicide occurring during its commission. Some authorities view the felony murder statutes as imputing or irrebuttably presuming a specific intent to kill from the association of the homicide with the underlying felony. These same authorities acknowledge "(l)ong standing judicial approval of the presumption provides strong indication that the presumption comports with due process."

> The appellant argues, however, that only 0.5% of robberies result in homicide. Therefore, it cannot be said the robber in every case intended to kill. This may be true, but we think it overlooks the great danger the aggressor willfully imposes upon his victim. The constituent crime with its hazardous potential is that which the legislature intended to deter by permitting capital punishment if death results from the felonious undertaking.

> Presently, we can say without doubt the appellant schemed and participated in the unlawful undertaking which resulted in death. The subjunctive nature of the intention to kill makes it no less deliberate and no less deserving of capital punishment than if it had been expressed, in our opinion. The felon who causes death in furthering his crime manifests a callous disregard for human life, because he subordinates the life of the innocent to his desire for gain, thereby inviting the outrage of a society understandably bent upon protecting itself from physical violence.

*Culberson v. State*, 379 So.2d 499, 507 (Miss. 1979)(internal citations omitted).

¶28. Grayson also argues that Miss. Code Ann. § 99-19-101(5)(D) is unconstitutional for basically the same reasons. We addressed this issue as well in *Holland v. State*, 705 So.2d 307, 320 (Miss. 1997) (holding § 99-19-101 to be constitutionally sound). To deliver a death penalty verdict, a jury must find that the defendant actually killed the victim, attempted to kill the victim, intended that a killing take place, or contemplated that lethal force would be employed. Miss. Code Ann. § 99-19-101(7). This naturally has the effect of substantially limiting the class of individuals who can receive the death penalty. *Holland*, 705 So.2d at 320. The class of potential death penalty cases is further limited by statute in other ways, such as the situation in the instant case where a defendant has killed during the commission of a robbery. *Id.* (citing § 97-3-19(2)(a), (d), (e), and (g)). In light of these factors, we reaffirm *Holland* and reject Grayson's constitutional claim on this issue.

### V. THE TRIAL COURT ERRED IN NOT GRANTING THE APPELLANT'S MOTION FOR MISTRIAL BASED ON COMMENTS MADE BY POTENTIAL JURORS

**DURING VOIR DIRE.**

¶29. Next, Grayson argues that he was entitled to a mistrial because of comments made during voir dire by Littlefield Eubanks, one of the veniremen. The standard of review applied to decisions of whether to grant a mistrial based upon the voir dire statements of potential jurors is abuse of discretion. *Evans*, 725 So.2d at 649. In *Evans*, a potential juror made improper statements during voir dire. *Id.* The trial court in that case denied the defendant's motion for a mistrial, but did not admonish the jury to disregard the comment. *Id.* We affirmed the trial court's ruling on the grounds that the prosecutor asked whether any jurors would be influenced by the statement during voir dire, and all agreed that it would not affect their decision. *Id.*

¶30. In case sub judice, the record reflects the following exchange during voir dire:

BY A JUROR: Your Honor, Littlefield Eubanks. I feel exactly the same way, under the circumstances of what I've heard in this case. If it's all true, then it would be automatic for me.[(5)]

BY THE COURT: So you're telling me, Mr. Eubanks, that if you believe from the evidence as presented that this man is guilty of capital murder, you would not be able to consider any evidence of mitigation or anything like that? You would just be automatically inclined to give the death penalty?

BY A JUROR: Your Honor, that's exactly what I'm saying, because *apparently he's mentally off* and - -

BY THE COURT: Wait. Wait.

BY MR. HARKEY: Excuse me - -

BY THE COURT: Don't say anything about your personal beliefs along those lines, sir. All I want to know is that are you inclined that, if he's found guilty, to automatically impose the death penalty?

BY A JUROR: Yes, ma'am.

(emphasis added).

¶31. Grayson made no objection to Eubanks's statement at the time it was made; at the conclusion of voir dire, however, he made a motion for a mistrial which was denied. The other jurors were neither questioned about the statement nor admonished to disregard it. Grayson appears to argue that this brief statement is inflammatory and served to "pervade" the jury.

¶32. The record reflects, however, that the trial judge quickly interrupted Eubanks's statement. While the court did not admonish the jury to disregard the statement and the prosecutor did not ask the prospective jury members at the time whether they would be able to disregard the statement, it did later ask whether they could be fair, and the prospective members indicated that they could be. That fact, combined with the brief nature of the comment, suggests that it was not so prejudicial as to warrant a mistrial, and the trial court did not abuse its discretion in denying that motion.

> **VI. THE TRIAL COURT ERRED IN STRIKING JURORS BRIDGET PHILLIPS AND BERNARD GOFF WITHOUT PROPER SHOWING THAT THE POTENTIAL JURORS COULD NOT FOLLOW THE LAW IN REGARD TO THE DEATH PENALTY.**

¶33. Grayson next argues that two prospective jurors, Bridget Phillips and Bernard Goff, were improperly struck for cause due to their statements made during voir dire indicating that they had strong reservations about imposing the death penalty due to their religious convictions. Specifically, Grayson argues that the rights of the two jurors themselves guaranteed under the First Amendment's Free Exercise Clause were violated by their being struck. Grayson analogizes striking a juror for religious reasons to striking one for racial reasons. This analogy is inapposite, however, because the rights of individual jurors to sit on a jury panel are outweighed by the State's legitimate interest in excluding jurors whose opposition to capital punishment will not allow them to view the proceedings impartially, and who therefore might frustrate a State's lawful administration of the death penalty.

¶34. The U.S. Supreme Court articulated a clear standard for when a juror who voices objections to the death penalty may be challenged for cause. *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)("[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court").

¶35. We have also considered an argument similar to Grayson's in *Thorson v. State*, 721 So.2d 590 (Miss. 1998). There, the State exercised peremptory challenges against two jurors solely because they belonged to a religious sect known as the Holiness Faith. *Thorson*, 721 So.2d at 593. We reversed, holding that exercise of such challenges was prohibited by Article 3, Section 19 of the Mississippi Constitution. *Id.* at 594. However, we also noted that the potential jurors at issue could have been struck if voir dire had revealed that they were truly unable to "sit in judgment of [their] fellow man regardless of the position of the Holiness Faith." *Id.* at 595. In such a case, there would be valid reason for striking such a juror for cause, and in fact, the striking of one of the two *Thorson* jurors was held to be harmless error because there were additional, permissible reasons for striking her. *Id.* Since the record in this case reflects that both Phillips and Goff stated that they would be unable to consider giving the death penalty if they found Grayson guilty, the rule established in *Thorson* is inapplicable to Grayson's case, and this issue is without merit.

### VII. THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S MOTION FOR FUNDS FOR PRIVATE INVESTIGATOR AND JURY CONSULTANT DESPITE REPEATED REQUESTS BY THE APPELLANT.

¶36. The trial court's decision on a motion for funding for consultants or investigators for an indigent defendant is reviewed for abuse of discretion. *Hansen v. State*, 592 So.2d 114, 125 (Miss. 1991). Grayson submitted two motions for funds for a private investigator, one dated March 7, 1997, and the other dated July 7, 1997. He also made an oral motion for funds to procure a jury consultant on June 27, 1997. The trial court delayed ruling on that motion pending the filing of a formal motion, but the record contains no such motion, and the issue is not raised again during the trial. Grayson made a final ex parte motion on July 31, 1997, requesting funds for a second investigator to pursue exculpatory evidence from an unidentified out-of-state witness.

¶37. On the issue of the jury consultant, we have said that "[t]he movant bears the responsibility of obtaining a ruling from the court on a motion filed by him and his failure to secure such a ruling constitutes waiver." *Johnson v. State*, 461 So.2d 1288, 1290 (Miss. 1984)(holding that denial of funds to hire forensic expert

for defense was not abuse of discretion where defense counsel was supposed to supply court with list of potential experts but failed to do so). Furthermore, the Fifth Circuit has recently held that the right of an indigent to a court-appointed psychiatric expert does not extend to a right to a jury-selection expert. ***Moore v. Johnson***, 225 F.3d 495, 503 (5th Cir. 2000). There, the court noted that "a defendant cannot expect the state to provide him a most-sophisticated defense; rather, he is entitled to 'access to the raw materials integral to the building of an effective defense.'" ***Moore***, 225 F.3d at 503 (citing ***Ake v. Oklahoma***, 470 U.S. 69, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)).

¶38. On the issue of funding for a private investigator, the record is clear that Grayson did in fact receive funding for an investigator named Clayton M. Hall up to a maximum of $750, and the trial court in fact ordered that the county pay that investigator the sum of $500 in satisfaction of Hall's bill. The court never ruled on funding for the second investigator, one James Bowman, which is tantamount to a denial of Grayson's motion.

¶39. We have recognized that "there may be instances, when in fairness, the state should be required to provide and pay for non-legal personnel needed by the defense" upon a showing of substantial need. ***Hansen v. State***, 592 So.2d at 125. The accused is required to offer concrete reasons for requiring such assistance, not "undeveloped assertions that the requested assistance would be beneficial . . . ." ***Id.*** at 125 (citing ***Caldwell v. Mississippi***, 472 U.S. 320, 323 n.1, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)).

¶40. The trial court had already approved $750 in funds for one investigator, not all of which was spent. The second motion stated that funds were needed to contact a "possible exculpatory witness" without any further information, as well as to arrange to subpoena this witness and transport him or her to Grayson's trial. In light of this sparse information, the trial court did not abuse its discretion in denying the motion for additional funds.

## SECTION 99-19-105(3) REVIEW

¶41. As a final matter, we must also review the death sentence in accordance with Miss. Code Ann. § 99-19-105(3), which states:

(3) With regard to the sentence, the court shall determine:

(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

(b) Whether the evidence supports the jury's or the judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;

(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and

(d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error or both.

¶42. Under this analysis, there is no evidence supporting a finding that the death sentence was imposed

under the influence of passion, prejudice or any other arbitrary factor. Indeed, the analysis of the change of venue issue above compels a conclusion that there was no overwhelming passion or prejudice influencing this case. The evidence that Grayson was under sentence of imprisonment at the time of the murder is undisputed and satisfies § 99-19-105(3)(b). Finally, we have previously held that the imposition of the death penalty on a defendant convicted of murder during a robbery in which he stabbed the victim 31 times was not disproportionate. *Wilcher v. State*, 697 So.2d 1087 (Miss. 1997). Giving the equally heinous nature of the crime committed here, imposition of the death penalty on Blayde Grayson is neither excessive nor disproportionate in comparison to his crime. See Appendix.

## CONCLUSION

¶43. For these reasons, Grayson's conviction and sentence are affirmed.

¶44. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION ARE AFFIRMED.**

> **PITTMAN, C.J., SMITH, P.J., AND WALLER, DIAZ AND EASLEY, JJ., CONCUR. McRAE, P.J., CONCURS IN RESULT ONLY. CARLSON AND GRAVES, JJ., NOT PARTICIPATING.**

## APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Stevens v. State*, So.2d (Miss. 2001).

*Mitchell v. State,* 792 So.2d 192 (Miss. 2001).

*Puckett v. State,* 788 So.2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So.2d 639 (Miss. 2001).

*Jordan v. State,* 786 So.2d 987 (Miss. 2001).

*Manning v. State,* 765 So.2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So.2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (iiMiss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi,* 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

**\*Jones v. State**, 517 So. 2d 1295 (Miss. 1987)**, Jones v. Mississippi**, 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) rema nding for new sentencing hearing.

**Wiley v. State**, 484 So. 2d 339 (Miss. 1986).

**Johnson v. State**, 477 So. 2d 196 (Miss. 1985).

**Gray v. State**, 472 So. 2d 409 (Miss. 1985).

**Cabello v. State**, 471 So. 2d 332 (Miss. 1985).

**Jordan v. State**, 464 So. 2d 475 (Miss. 1985).

**Wilcher v. State**, 455 So. 2d 727 (Miss. 1984).

**Billiot v. State**, 454 So. 2d 445 (Miss. 1984).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

**Stringer v. State**, 454 So. 2d 468 (Miss. 1984).

**Dufour v. State**, 453 So. 2d 337 (Miss. 1984).

**Neal v. State**, 451 So. 2d 743 (Miss. 1984).

**Booker v. State**, 449 So. 2d 209 (Miss. 1984).

**Wilcher v. State**, 448 So. 2d 927 (Miss. 1984).

**Caldwell v. State**, 443 So. 2d 806 (Miss. 1983).

**Irving v. State**, 441 So. 2d 846 (Miss. 1983).

**Tokman v. State**, 435 So. 2d 664 (Miss. 1983).

**Leatherwood v. State**, 435 So. 2d 645 (Miss. 1983).

**Hill v. State**, 432 So. 2d 427 (Miss. 1983).

**Pruett v. State**, 431 So. 2d 1101 (Miss. 1983).

**Gilliard v. State**, 428 So. 2d 576 (Miss. 1983).

**Evans v. State**, 422 So. 2d 737 (Miss. 1982).

**King v. State**, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE

### AND SENTENCE PHASE

*Randall v. State,* -- So. 2d -- (Miss. 2001).

*Flowers v. State,* 773 So.2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So.2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State*, 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State*, 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

**DEATH CASES REVERSED AS TO GUILT PHASE**

**AND SENTENCE PHASE**(continued)

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

**DEATH CASES REVERSED**

**AS TO PUNISHMENT AND REMANDED**

**FOR RESENTENCING TO LIFE IMPRISONMENT**

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

**DEATH CASES REVERSED AS TO**

**PUNISHMENT AND REMANDED FOR A NEW TRIAL**

**ON SENTENCING PHASE ONLY**

*King v. State,* 784 So.2d 884 (Miss. 2001).

*Walker v. State,* 740 So.2d 873 (Miss. 1999).

*Watts v. State,* 733 So.2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

**\*Shell v. State**, 554 So. 2d 887 (Miss. 1989), **Shell v. Mississippi**, 498 U.S. 1 (1990) reversing, in part, and remanding, **Shell v. State** 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

**\*Pinkney v. State**, 538 So. 2d 329 (Miss. 1989), **Pinkney v. Mississippi,** 494 U.S. 1075 (1990) vacating and remanding, **Pinkney v. State,** 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

**\*Clemons v. State**, 535 So. 2d 1354 (Miss. 1988), **Clemons v. Mississippi**, 494 U.S. 738 (1990) vacating and remanding, **Clemons v. State**, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

**\*Jones v. State**, 517 So. 2d 1295 (Miss. 1987), **Jones v. Mississippi,** 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

# DEATH CASES REVERSED AS TO

# PUNISHMENT AND REMANDED FOR A NEW TRIAL

# <u>ON SENTENCING PHASE ONLY</u>

## <u>(continued)</u>

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State*, 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

1. During the hearing on the motion to suppress Grayson's confession, Miller did not elaborate on how he learned Grayson was in Florida except to say "I received some information that he was in Florida."

2. The record does not reveal exactly when this interview began or how long it lasted. Testimony by Sheriff Miller offered at the suppression hearing indicated that Grayson had given a statement to Escambia County law enforcement officials about the Florida robberies at approximately 2050 hours (or about 8:50 P.M.). The interview with Sheriff Miller ended at approximately 2250 hours (about 10:50 P.M.), but no further information about the length of the interview is contained in the record. Miller testified that he only spoke to Grayson for a few minutes, and Grayson's attorney not only did not challenge that assertion, he actually supplied the number of minutes by asking "About three or four minutes?" to which the Sheriff responded "Something like that."

3. The quoted material is being read from a transcript of Miller's interview of Grayson in Escambia County, which was admitted as evidence in the suppression hearing, but was not offered into evidence at trial and is not in the record currently before this Court.

4. Sheriff Miller later testified that he did not know if hair and blood samples were actually taken, and no such samples were offered as evidence at trial.

5. This remark was made in response to another juror's statement that she would automatically vote to impose the death penalty if she found the defendant guilty.